**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _______________

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, a federally recognized Indian Tribe,

*Plaintiff*,

v.

JARED POLIS, Colorado Governor, in his official capacity;

DAN GIBBS, Director, Colorado Department of Natural Resources, in his official capacity;

LAURA CLELLAN, Director, Colorado Parks & Wildlife, in her official capacity,

*Defendants*.

---

**COMPLAINT FOR DECLARATORY RELIEF**

---

Comes now, Plaintiff, UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION (the "Ute Indian Tribe" or "Tribe"), a federally recognized Indian Tribe, by and through its undersigned counsel, and complains of the Defendants, as follows:

## GENERAL NATURE OF ACTION

1. This action arises from Governor Jared Polis, Dan Gibbs, and Laura Clellan's (collectively referred to herein as "Defendants") ongoing violations of federal law through the enactment

and enforcement of House Bill 25-1163, codified in C.R.S. § 33-12-103.8 ("Statute"), providing free access to state parks for the federally recognized Southern Ute Indian Tribe and the Ute Mountain Ute Tribe, because the Statute is unconstitutional as applied to the members of the federally recognized Ute Indian Tribe of the Uintah and Ouray Reservation (the Southern Ute Indian Tribe, Ute Mountain Ute Tribe, and the Ute Indian Tribe of the Uintah and Ouray Reservation are collectively referred to as the "Utes").

2. This action alleges multiple ongoing violations of federal law by Defendants via the enactment and enforcement of the Statute, specifically, their violation of the Brunot Agreement of 1874 ("Brunot Agreement"), the Article IV Supremacy Clause, the Fourteenth Amendment Equal Protection Clause, the First Amendment Free Exercise Clause, the American Indian Religious Freedom Act ("AIRFA"), and 42 U.S.C. § 1983.

3. The Tribe seeks a declaration that C.R.S. § 33-12-103.8, as written and applied to the Ute Indian Tribe violates the terms of the Brunot Agreement, and that the Brunot Agreement guarantees the Tribe the right to hunt, fish, and gather within the Brunot area lands to the same extent as the Ute Mountain Ute Tribe and the Southern Ute Indian Tribe.

4. The Tribe seeks a declaration that the Statute as written and applied to the Ute Indian Tribe violates the Equal Protection Clause of the Fourteenth Amendment and the Free Exercise Clause of the First Amendment as incorporated by the Fourteenth Amendment because it infringes upon the fundamental right of the Tribe's members to practice their religion.

5. The Tribe seeks a declaration that the Statute as written and applied to the Ute Indian Tribe deprives the Tribe of its First Amendment and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to: (a) 28 U.S.C. § 1331 (federal question action), in that this is a civil action arising under the Constitution, laws or treaties of the United States, (b) 28 U.S.C. § 1362 (federal question action brought by an Indian Tribe), in that this is a civil action brought by an Indian Tribe with a governing body duly recognized by the Secretary of the Interior ("Secretary") and the matter in controversy arises under the Constitution, laws, or treaties of the United States.

7. This action arises under the Constitution, laws, and treaties of the United States, as hereinafter more fully appears, including but not limited to: the Supremacy Clause, U.S. Const. Art IV, cl. 2; the Free Exercise Clause; U.S. Const. amend I, cl. 2.; the Equal Protection Clause; U.S. Const. amend XIV, § 1; the Treaty with the Tabeguache Band, October 7, 1863, 13 Stat. 673 ("1863 Treaty"); Treaty with the Ute, March 2, 1868, 15 Stat. 619 ("1868 Treaty"); the Brunot Agreement of 1874 ("Brunot Agreement") ratified by Act of April 29, 1874, 18 Stat. 36; Agreement with the Confederated Bands of Ute, 1880, ratified by Act of June 15, 1880, 21 Stat. 199; the American Indian Religious Freedom Act ("AIRFA"), Pub. L. 95-341, 92 Stat. 469 (1978) (codified as amended at 42 U.S.C. § 1996); The Civil Rights Act of 1964, Pub. L. 104-317, Title III, § 309(c), Oct 19, 1996, 110 Stat. 3853 (codified as amended at 42 U.S.C. § 1983); the Declaratory Judgments Act, codified in 28 U.S.C. §§ 2201-02; and the federal common law.

8. The Ute Indian Tribe has *parens patriae* ("parent of the country") standing to bring these claims because the Tribe is seeking to "prevent [and]/or repair harm to its 'quasi-sovereign' interests." *BP America, Inc. v. Oklahoma ex rel. Edmondson*, 613 F.3d 1029, 1031 n* (10th Cir. 2010)

(quoting *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 257 (1972)). Moreover, the Tribe has standing because it has an interest apart from the interest of particular private parties, and it alleges an injury to a sufficiently substantial segment of its population. *Alfred L. Snapp & Son, Inc.* 458 U.S. at 607.

9. An actual controversy exists between the parties under Article III of the United States Constitution and within the meaning of 28 U.S.C. § 2201(a), so this Court may grant declaratory relief and other relief pursuant to 28 U.S.C. §§ 2201-02.

10. Defendants are not entitled to sovereign immunity because this suit is seeking prospective relief for ongoing violations of federal law committed by Defendant state officials in their official capacities. *See Ex Parte Young*, 209 U.S. 123, 159-60, (1908); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984); *see also Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 608 (10th Cir. 1998).

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in the judicial district and have their offices located in the judicial district. Further, a substantial part of the events or omissions giving rise to this action occurred in this judicial district, as the state parks at the center of the dispute are located in the judicial district.

## PARTIES

12. Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation is a federally recognized sovereign Indian Tribe. 87 Fed. Reg. 4636 (Jan. 28, 2022). The Tribe is organized in two ways under the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5101-5144.[1] The Tribe is

[1] The IRA is "a statute specifically intended to encourage Indian tribes to revitalize their self-government." *Fisher v. District Court*, 424 U.S. 382, 387 (1976). The IRA implements a federal

organized as a tribal government under 25 U.S.C. § 5123 and is also chartered as a federal corporation under 25 U.S.C. § 5124. The Tribe is comprised of three bands of Ute Indians: the Uintah, Whiteriver, and Uncompahgre (also known as the Tabeguache) bands. The Tribe occupies the Uintah and Ouray Reservation in the Green River Basin in northeastern Utah. The Reservation lies within a portion of the Tribe's aboriginal lands and encompasses just over four million acres within the Reservation's exterior boundaries. The Uncompahgre band is a signatory of and a party to the 1863 Treaty,[2] 1868 Treaty, and the Brunot Agreement. The Uintah and Whiteriver bands are both signatories of and parties to the 1868 Treaty and Brunot Agreement.

13. Defendant JARED POLIS is the Governor of Colorado, who retains the "supreme executive power of the state" and must "take care the laws be faithfully executed." Colo. Const. art. IV, § 2. *Ainscough v. Owens*, 90 P.3d 851, 858 (Colo. 2004) ("when challenging the constitutionality of a statute… [T]he Governor is an appropriate defendant.") The Governor

---

policy of reestablishing tribal governments, reconstituting tribal land bases, and revitalizing tribal economies and cultures. *Cohen's Handbook of Federal Indian Law* §4.04[3][a], p. 256 (Nell Jessup Newton ed., 2012).

[2] Because the Uncompahgre were the largest band to attend the treaty talks, the treaty commission decided to negotiate only with them in 1863. Fred A. Conetah, *A History of the Northern Ute People*, 50, (Kathyrn L. MacKay et al. eds., 1982.) However, the terms of the 1863 Treaty were reaffirmed in Article I of the 1868 Treaty, which stated, "All of the provisions of the treaty concluded with the Tabeguache band of Utah Indians October seventh, one thousand eight hundred and sixty-three… are hereby re-affirmed and declared to be applicable and to continue in force as well *to the other bands,* respectively, parties to this treaty, as to the Tabeguache band of Utah Indians." Treaty with the Tabeguache Band, Oct. 7, 1863, 13 Stat. 673 ("1863 Treaty").

of Colorado takes an oath to "support the constitution of the United States" which encompasses the Article IV Supremacy Clause.[3] C.R.S. § 24-12-101. He is sued in his official capacity.

14. Defendant DAN GIBBS is the Director of the Colorado Department of Natural Resources, and is responsible, *inter alia*, for overseeing the governmental department that manages resources and conservation efforts for the state of Colorado and carrying out laws related thereto. He is sued in his official capacity.

15. Defendant LAURA CLELLAN is the Director of Colorado Parks & Wildlife, the state agency responsible for, *inter alia,* overseeing the state park system and carrying out laws related thereto. She is sued in her official capacity.

## **BACKGROUND**

16. The Statute enacted and enforced by Defendants states that the "vast majority of Colorado's state parks are located on ancestral lands of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe. These ancestral lands may also include sacred sites of the Southern Ute Indian Tribe and Ute Mountain Ute Tribe. Providing free access to Colorado state parks to members of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe reduces certain financial barriers that may otherwise prevent tribal members from accessing state parks." C.R.S. § 33-12-103.8(1)(a)(II). As such, it allows enrolled members of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe to enter Colorado state parks without paying an entrance fee. C.R.S. § 33-12-103.8.

[3] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. Art IV, cl. 2.

17. Defendants' enactment and enforcement of the Statute unlawfully ignores the Ute Indian Tribe and its history within what it is today the State of Colorado. It also ignores the reality that most lands covered by the Statute fall within the historic aboriginal lands of the Ute Indian Tribe's bands, descendants of which Defendants are unlawfully discriminating against.

18. While H.B. 25-1163 was making its way through the legislative process, the Tribe delivered a formal letter to Defendants and the bill's sponsors respectfully requesting it be included in the legislation.

19. The letter advised Defendants that the legislation as drafted "perpetuates the erasure of the Ute Indian Tribe and its history within the State of Colorado" and proposed amendments to the bill to address these concerns. A copy of the letter is attached hereto as Exhibit A.

20. The Tribe received a response from Colorado State Representative Katie Stewart, who stated that she read the Tribe's letter, and would respond with more information regarding next steps, and that she would consult with the Colorado General Assembly's leadership and the Department of Natural Resources. The Tribe never heard back from Representative Stewart after her initial response, nor did it ever receive a response from the other Defendants or their respective offices.

21. The bill passed without acknowledging, much less addressing, the discriminatory impact it has on the Ute Indian Tribe, perpetuating a violent history seeking to erase its people and its culture.

## I. A History of Broken Treaties and Removal

22. The Ute people are the oldest continuous residents of what is now the State of Colorado.

23. "There is little written information about the Ute People prior to 1650 A.D. European explorers first saw the Ute People in northern New Mexico, Colorado, and eastern Utah. When they

came to those places, and how long they had been there[,] is not known. The oral tradition of the People indicates that they had always been there." Conetah, *supra* fn. 2 at 1.

24. The bill's legislative declaration recognizes this history, stating that "[t]he Ute People are the oldest continuous residents of what is today the state of Colorado. They have no migration story, but have been here since time immemorial." H.B. 25-1163, 75th Gen. Assemb., Reg. Sess. (Co. 2025). A copy of the bill is attached hereto as Exhibit B.

25. The 1863 Treaty between the United States and the Utes delineated that, in exchange for giving up a great deal of their ancestral homelands east of the Continental Divide, as well as Middle Park, the Utes would receive "$10,000 worth of annuities—food and provisions, each year, for ten years as well as a few stallions to improve their horse stock." *Conejos Treaty,* COLORADO ENCYCLOPEDIA, https://coloradoencyclopedia.org/article/conejos-treaty#id-field-author.

26. Nevertheless, "as with most other Indian treaties, the [federal] government failed to provide the promised annuities." *Id.*

27. The vast amount of land already "ceded"[4] by the terms of the 1863 Treaty was not enough to satisfy demands for land by settlers—especially in the wake of the Homestead Act of 1862. *Ute Treaty of 1868,* COLORADO ENCYCLOPEDIA, https://coloradoencyclopedia.org/article/ute-treaty-1868.

28. Consequently, the 1868 Treaty "created for the Utes a massive reservation on Colorado's Western Slope in exchange for ceding the Central Rockies to the United States." *Id.*

[4] There was confusion as to the validity of the 1863 Treaty for the Uintah and Whiteriver Bands of the Ute Indian Tribe and its legitimacy at large because the Uncompahgre were the only band to sign the 1863 Treaty.

29. As this Court noted, "[i]nk on the 1868 treaty was hardly dry before a major invasion of miners entered Ute lands in violation of the treaty." *Cuthair v. Montezuma-Cortez, Colorado Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1157 (D. Colo. 1998).

30. So yet again, "the US government failed to fulfill the treaty's obligations, and its coercive attempts to assimilate the Utes led to the bloody Meeker Incident of 1879 and the removal of most of Colorado's Utes in the early 1880s." *Supra*, ¶ 27.

31. Leading up to their removal, "the Uncompahgre leaders sent word to Washington through the commissioners they did not wish to relocate.... Washington responded unequivocally: you will move, or be removed." Peter R. Decker, *"The Utes Must Go!" American Expansion and the Removal of a People,* 180 (Council Oak Books, 2004).

32. As to where they would be removed, "Except in very general terms, the White River, Uncompahgre, and southern bands did not know where they were being moved, or when or how, if at all, they would be compensated for their 'ceded' land." *Id.* at 173.

33. As the rallying cry of the times went, "the Utes Must Go!" *Fourth Grade Ute Resource Guide – Nuu–ciu Strong*, COLORADO COMM'N OF INDIAN AFFAIRS, https://ccia.colorado.gov/fourth-grade-ute-resource-guide.

34. Echoing this rallying cry, "[i]n February 1876, the year of statehood, the Colorado legislature memorialized a desire for the removal of the Utes to Indian territory. Early in 1878, several bills were introduced into Congress to secure removal of the Utes." *Cuthair,* 7 F. Supp. 2d at 1156.

35. To note, "[b]y June 1880, the U.S. Congress had passed legislation to require the White River Utes and the Uncompahgre Utes to abandon their traditional homelands [in Colorado] and

move to much smaller and less verdant reservations in Utah. They were forcibly removed the following year." *Supra* ¶ 33 at 113; Act of June 15, 1880, ch. 223, 21 Stat. 199.

36. The 1880 law required the United States to place the Uncompahgre in an area "near the mouth of the Gunnison River" around present-day Grand Junction, Colorado "if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah." Act of June 15, 1880, ch. 223, 21 Stat. 199 (21 Stat. 200). There was substantial agricultural land near the mouth of the Gunnison, and there were virtually no agricultural lands in the area that became the replacement Uncompahgre Reservation, which consisted of uninhabitable high desert in Utah Territory. *See* P. David Smith, *Ouray, Chief of the Utes* (1986) (discussing the machinations that results in the Commission appointed under the 1880 Act voting 3-2 to expel the Uncompahgre Utes to the barren wasteland in Utah, and stating: "it is strange that Grand Junction, the largest city on the Western Slope of Colorado, now stands on the spot that was rejected as too barren for the Utes." Mr. Smith further notes that Commissioner Otto Mears, who was the primary proponent of expelling the Uncompahgre "is quoted as having later said he knew the region [near the mouth of the Gunnison] was fertile," but that he voted to expel the Uncompahgre to Utah anyway. *Id.* at 190.). The State appears to be using this fact of forced removal from Colorado to now wrongfully distinguish between the Ute Indian Tribe and the other bands.

37. This forced removal in 1880 occurred a little over a decade after the Ute people and the United States signed the Ute Treaty of 1868, which granted the Utes a large portion of what is now Western Colorado. *See* Treaty with the Ute, Mar. 2. 1868, 15 Stat. 619.

38. As one historian framed it: "The horrors of removal belied a peaceful history with the United States government, as Ute leaders had negotiated and signed treaties that designated twelve million acres of western Colorado for Utes. The treaties were broken less than a decade later." Brandi Denison, *Ute Land Religion in the American West*, 25, (Margaret D. Jacobs, et al. 2017).

39. The State acknowledges this history, and that the Ute Indian Tribe was "relocated [from Colorado] at gunpoint to the Uintah-Ouray Reservation in 1880."[5]

40. The United States also acknowledges this history of broken treaties. "It is important to note that a series of treaties with the Utes existed… that were violated by the United States government just before the current reservation system was enacted. These include the Treaty with the Tabeguache (1863), the Treaty with the Utes (1868) and the Brunot Agreement of 1874." U.S. FOREST SERV, *Rio Grande Nat'l Forest – Assessment 12, Areas of Tribal Importance,* https://www.fs.usda.gov/r02/riogrande/planning (last visited December 4, 2025).

41. Despite the ambiguities and confusion as to where the Utes would be relocated, how they would be compensated (if at all), and the validity of the agreement itself, removal marched forward. Secretary of the Interior Samuel Kirkwood made it clear:

> If the Indians will not go without force, request the officer in command [Mckenize] [sic] to compel removal. If the Indians will not move because they have not received compensation for their improvement, assure the Indians that money will be paid to them at the new agency. If the refusal is absolute, have [the military] proceed at once.
>
> *Id.* at 186.

---

[5] This quote comes from a Colorado Parks and Wildlife site sign at Hayden Meadows, part of the state's Arkansas Headwaters Recreation Area. A picture of the marker which includes a map of Ute Territory is attached as Exhibit C.

42. Following his orders, Colonel Mackenzie informed the Ute Indian Tribe, "If you will not go of your own accord. I will make you go." *Id.*

43. As a result, "[w]ith a gun pointed at their heads, the [Ute Indian Tribe] had no option but to agree to move… [and] with their possessions loaded onto their backs and leading their horse travois, 1,458 men, women, and children set out on the 350-mile march into Utah." *Id.*

44. Prior to being marched at gunpoint through the Rocky Mountains to Utah, "[t]he calvary had given them two hours to pack what they could carry. Everything else was left behind." Denison, *supra*, ¶ 38 at 25.

45. Thus, the Ute Indian Tribe does in fact have a migration story, albeit a forced one rooted in broken treaties and racial animus. *See Cuthair* 7 F. Supp. 2d at 1155 ("Although this lawsuit was not filed until 1989 by these [Ute] Plaintiffs, the history of discrimination against Native Americans in the United States, and Colorado in particular, goes back well over 100 years.")

46. The effects of this history of broken treaties, racial animus, and forced displacement are acutely felt to this day by Ute Indian Tribal members in such fundamental aspects as health disparities (*e.g.* 25 U.S.C. §1601(5) ("unmet health needs of the American Indian people are severe and the health status of Indians is far below that of the general population of the United States")) and justice services (*e.g.* Tribal Law and Order Act of 2010, Pub.L.No. 111-211, Title II, July 29, 2010, 124 Stat. 2258 at §202(a)(1), 25 U.S.C. §2801 note ("the complicated jurisdictional scheme that exists in Indian country . . . has a significant negative impact on the ability to provide public safety to Indian communities . . . .")).

47. The Statute compounds these effects and is yet another attempted forcible removal of the Ute Indian Tribe by Colorado State actors.

## II. Brunot Agreement Background

48. All of Ute Indian Tribe's bands signed the Brunot Agreement of 1874, same as the bands that make up the Ute Mountain Ute Tribe and the Southern Ute Indian Tribe. Brunot Agreement of 1874, ratified by Act of April 29, 1874, 18 Stat. 36. Thus, there is no historical and/or legal foundation for Defendants to distinguish between the various bands as signatories as it relates to Brunot Agreement rights.

49. In negotiating the terms of the Brunot Agreement, "the [Ute] People were determined to give up only the mineral lands: '[t]he mountains with the mines we will sell but those where the mines are not in we will not sell… the white men can go and take the gold and come out again. We do not want them to build houses there.'" Conetah, *supra* fn. 2 at 61.

50. As the historical record indicates, "Ute leaders claimed that they had sold only the mining regions and not the entire area and that the miners were to leave each winter. These claims were allegedly confirmed by negotiators." *Cuthair,* 7 F. Supp. 2d at 1157.

51. However, "Brunot demanded that all of the San Juan district be ceded" and ultimately, "[t]his so-called Brunot Agreement… took the whole San Juan district, [close to] four million acres, for the invading miners. This drove a wedge in between the northern and southern portions of the Ute Indian Reservation." Conetah, *supra* fn. 2 at 61.

52. The Brunot Agreement was ratified by Congress on April 29, 1874. Act of April 29, 1874, 18 Stat. 36.

53. Almost ninety years later, "[i]n 1962, the Indians Claims Commission held that the consideration paid to the Utes for lands ceded in the Brunot Agreement was so inadequate as

to be unconscionable." *Cuthair,* 7 F. Supp. 2d at 1159 (citing *Confederated Bands of Ute Indians v. United States*, 11 Ind. Cl. Comm. 180, 303 (1962)).[6]

54. The Brunot Agreement has not been abrogated by Congress, nor has Congress ever expressed and explicit intent to do so.

## III. Brunot Agreement Rights

55. The most relevant provision of the Brunot Agreement in this action is Article II, which states, "[t]he United States shall permit the Ute Indians to hunt upon said lands so long as the game lasts and the Indians are at peace with the white people." Act of April 29, 1874, 18 Stat. 36.

56. The legislative declaration of H.B. 25-1163 states, "[p]ursuant to the Brunot Agreement of 1874, the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe retain hunting, fishing, and gathering rights outside of their respective reservations. The area where the tribes retain these rights includes lands which are now state parks managed through intergovernmental agreements among the state and the tribes." H.B. 25-1163, 75th Gen. Assemb., Reg. Sess. (Co. 2025.

57. As every band of the Ute Indian Tribe was a signatory to the Brunot Agreement, same as the bands of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe, the Ute Indian Tribe retains the same rights under the Brunot Agreement. Therefore, Defendants are wrongly discriminating between the bands, violating the Ute Indian Tribe's Brunot Agreement rights.

---

[6] "The land they ceded—virtually all of western Colorado with its wealth of timber and minerals and five fertile river valleys—for a reservation in Utah, was not an equal exchange, nor was it a voluntary one." Decker, *supra* ¶ 31 at XIII.

## IV. Related Ute Religious and Spiritual Beliefs

58. "The Ute Bands [are] tied through their religion." Conetah, *supra* fn. 2 at 2. Hunting has important historical, cultural, and religious significance for all Ute people in part because "[t]he Ute People followed the cycle of the seasons. Each group traveled within a specific territory in search of foods, *returning to familiar hunting and gathering areas year after year.*" Conetah, *Id* at 9 (emphasis added).

59. Moreover, "the Utes, similar to all Indians, held deep respect for the powerful and creative acts of nature. All natural events in the universe—a sunrise, lightning and thunder, a blossoming tree—possess for them inherent and important explanations." Decker, *supra* ¶ 31 at 11.

60. Accordingly, "[c]eremonies, *including hunting*, played an important role in the life of the Utes" and "[a]n Indian hunted as much for its ritual importance as for the source of food." *Id.* (Emphasis added).

61. In fact, the Southern Ute Indian Tribe's Division of Wildlife allows for special authorization to hunt for cultural or ceremonial purposes within the Brunot area outside of regular seasons. *2024-2025 Brunot Area Hunting & Fishing Proclamation For Brunot Area Hunting & Fishing by Southern Ute Tribal Members*, SOUTHERN UTE INDIAN TRIBE DIVISION OF WILDLIFE RESOURCE MANAGEMENT, https://www.southernute-nsn.gov/wp-content/uploads/sites/15/2024/07/2024-25_Draft_Brunot_Proc-2.pdf.

62. The ritualistic importance of hunting stems from the view that "[a]nimals, considered the equal of man, had come to the land as envoys from another world, carrying with them their own powerful and truth-telling myths. They provided Indians with sustenance to their lives and hence were accorded great respect, if not reverence." Decker, *supra* ¶ 31 at 11.

63. For example, "[i]n nature's world, a buffalo gave his life so that Utes might live and survive", so "[t]o indiscriminately slaughter a buffalo (or any other animal) only for the sake of killing or for its hide or tongue was both a crime against nature and an act of massive disrespect."[7] *Id.*

64. The Bear Dance, one of the most important religious ceremonies for the Ute people, traces its origins to hunting:

> The origin of the Ute Bear Dance relates the time when two brothers were out hunting in the mountains and as they became tired, they laid down to rest. One of the brothers noticed a bear standing upright facing a tree and seemed to be dancing and making a noise while clawing the tree… The one brother went on hunting while the other brother continued to observe the bear. The bear taught the young man to do the same and also taught the young man the song that went with the dance. He told the young man to return to his people and teach them the dance and songs of the bear. The songs according to legends show respect for the spirit of the bear and the respect to the bear spirit makes one strong.

*Bear Dance*, SOUTHERN UTE DRUM, https://www.southernute-nsn.gov/culture/bear-dance/.

65. Remarkably, "the [bear] dance may indeed be well over 1,000 years old" and "continues to be performed even to this day." Sally McBeth, *Mediating Indianness,* 213 (Cathy Covell Waegner, 2015), https://www.unco.edu/hss/anthropology/pdf/mcbeth/bear-is-our-protector.pdf; Conetah, *supra* fn. 2 at 3.

66. In fact, the Utes "held ceremonies in the Crestone and Penitente Canyon areas and had an established Bear Dance site near present day San Acacio." *Supra* ¶ 40 at 9.

67. The trees found in Colorado's state parks also have historical, cultural, and spiritual significance for Ute people, as "[t]he Utes harvested the inner bark of the ponderosa pine for

---

[7] "When most tribal members intend to take a deer [] They thank the Creator for the food he provides and the animal for sacrificing it's life for them. An offering is usually given for the life they will take." *Year-round hunting*, UINTAH & OURAY UTE INDIAN TRIBE, A SPECIAL INFORMATION HANDOUT BY THE UTE BULLETIN, July 8, 1998, at 12. A copy of this newspaper article is attached as Exhibit D.

making healing compresses, tea and for healing. The scarred ponderosa trees are still visible in Colorado forests. The healing trees are evidence of the Utes early presence in the land and their close relationship to their ecosystem." *History*, SOUTHERN UTE INDIAN TRIBE, https://www.southernute-nsn.gov/history/.

68. These ponderosa trees that the Ute people are connected to on a spiritual level "are found throughout the Ute Nations aboriginal territory and traditional hunting grounds" now known as Colorado forests. Terry Knight, *Official Southern Ute and Ute Mountain Ute Statement: Addressing the False Cultural Connection of Bent Trees to Traditional Practices of the Ute Nation,* https://newspackcoloradosun.s3.amazonaws.com/wp-content/uploads/2021/10/Southern-Ute-and-Ute Mountain-Ute-Official-Statement-2019.pdf.

69. In sum, the Ute Indian Tribe's members have sincerely held religious and spiritual beliefs manifested, *inter alia,* through hunting and gathering and through ceremonies directly intertwined with and arising from their respect for, and deep connection to, the lands from which they were forcibly removed—lands that are now Colorado state parks.

## <u>FIRST CLAIM FOR RELIEF</u>

### <u>Violation of the Brunot Agreement: Defendants' Failure to Honor the Terms of the Agreement in Contravention of Federal Law</u>

70. The Tribe realleges the preceding paragraphs and incorporates them by this reference.

71. The Article IV Supremacy Clause of the United States Constitution commands that Defendants, by serving as state actors on behalf of Colorado, acknowledge the supremacy of federal law and must enforce and abide by it accordingly.

72. This includes acknowledging, abiding by, and honoring treaties the federal government executes with other sovereigns, including Indian Tribes. *E.g., Missouri v. Holland*, 252 U.S. 416 (1920).

73. The Brunot Agreement is valid federal law because "like treaties, agreements and statutes are the 'supreme law of the land,' creating rights and liabilities that are virtually identical to those established by treaties." *Cohen's Handbook of Federal Indian Law* § 1.04, p. 76 (Nell Jessup Newton ed., 2005). *See also Antoine v. Washington,* 420 U.S. 194, 204 (1975) ("Once ratified by Act of Congress, the provisions of the agreements become law, and like treaties, the supreme law of the land.")

74. By proposing, incorporating, and ratifying Article II of the Brunot Agreement, the United States established, as matter of federal law, the right of the Ute Indians to hunt, gather, and fish upon the lands described therein.

75. This federal commitment guaranteeing these rights for the Ute Indians was part of the explicit bargain exchanged for the Utes relinquishing rights in these aboriginal lands.

76. The Ute Indians that are signatories of and parties to the Brunot Agreement include every band comprising the Ute Indian Tribe: the Whiteriver Band, the Uncompahgre Band, and the Uintah Band.

77. The Ute Indians that are signatories of and parties to the Brunot Agreement also include the bands of what are known today as the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe.

78. The Brunot Agreement is to be interpreted liberally in favor of the Ute Indian Tribe, any ambiguities within the Brunot Agreement are to be resolved in the Tribe's favor, and the terms

of the Brunot Agreement are to be interpreted as the Tribe's members would have understood them. *E.g.*, *Bryan v. Itasca Cnty., Minnesota,* 426 U.S. 373, 392 (1976) (quoting *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918)) ("statutes passed for the benefit of . . . Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.")

79. Ute Indians were told and agreed to the condition of the Brunot Agreement that they could access the Brunot area lands to hunt "so long as the game lasts . . . ." *Supra* ¶ 55.

80. The Brunot Agreement remains valid today as a matter of federal law. *See e.g., Antoine,* 420 U.S. at 204 (Supremacy Clause precluded application of state game laws to tribal members in area ceded to the United States via an agreement ultimately ratified by Congress that preserved Indian hunting rights, even though the state was not a party to that agreement).

81. Defendants, as state actors, must adhere to and uphold federal law.

82. Defendants have breached and continue to breach the terms of the Brunot Agreement by putting an undue burden on the Ute Indian Tribal members' access to ancestral lands retained therein, and via their wrongful discrimination of the Ute Indian Tribe from the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe.

83. The undue burden and wrongful discrimination stems from the enforcement of C.R.S. § 33-12-103.8 as applied to the Ute Indian Tribe requiring its members to pay an entrance fee to state parks in the Brunot area—one that identically situated Tribes' members need not pay—to exercise hunting, gathering, and fishing rights retained as a matter of federal law.

84. There is a substantial controversy between the Tribe and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

85. The Ute Indian Tribe asks this Court to declare that Defendants are wrongly distinguishing the Ute Indian Tibe from the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe, and the proper interpretation and construction of the terms of the Brunot Agreement guarantees the Ute Indian Tribe the right to hunt, fish, and gather in the Brunot area lands, same as its sister-Tribe-signatories to the Brunot Agreement: the Ute Mountain Ute Tribe and the Southern Ute Indian Tribe.

86. The Ute Indian Tribe asks this Court to declare that C.R.S. § 33-12-103.8, as applied to the Ute Indian Tribal members, is preempted by the Brunot Agreement as it conditions the exercise of their hunting, gathering, and fishing rights under the Agreement on payment to the State of Colorado of an entrance fee to access the ancestral lands and sacred sites located in Colorado state parks.

## SECOND CLAIM FOR RELIEF

### Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection: C.R.S. § 33-12-103.8 Infringes on a Fundamental Right Held by the Ute Indian Tribe's Members

87. The Tribe realleges the preceding paragraphs and incorporates them by this reference.

88. State actors, like Defendants, operating under color of law may not treat individuals or entities disparately as compared to similarly situated individuals or entities when such disparate treatment burdens a fundamental right.

89. When such disparate treatment burdens a fundamental right, the highest level of scrutiny applies. *Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021).

90. It is well-established that the free exercise of religion is a fundamental right. *E.g. Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96, n. 3 (1976).

91. The Ute Indian Tribe is similarly situated to the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe in that it has "deep cultural, spiritual, ancestral, and historical ties to the majority of the land within Colorado, including much of the lands that are now designated as state parks, and have served as stewards of these lands and the cultural and natural resources provided by the lands since time immemorial." Exhibit A at 9.

92. The Ute Indian Tribe is similarly situated with the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe as all share the same kinship, culture, ancestral homelands, and sincerely held religious and spiritual beliefs dating back to time immemorial.

93. Thus, Defendants via the enactment and enforcement of the Statute are wrongly distinguishing between the Ute Indian Tribe and the sister Southern Ute Indian Tribe and the Ute Mountain Ute Tribe.

94. The members of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe are able to access state parks at no cost; where they can practice their religious and spiritual beliefs—the exact same beliefs and practices the Ute Indian Tribe has—and yet the Ute Indian Tribe is treated differently via its exclusion from the Statute by Defendants.

95. As applied, the Statute "seeks to reduce barriers for enrolled members of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe in accessing their ancestral lands and sacred sites located within Colorado's State Parks." Exhibit B, § 1(k).

96. The Statute conditions this access on "enrolled members of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe" presenting "a current tribal identification card..." C.R.S. § 33-12-103.8(2).

97. Thus, the Statute and Defendants' enforcement thereof unconstitutionally treats the Ute Indian Tribe differently than the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe.

98. Specifically, by acknowledging the Southern Ute Indian Tribe and Ute Mountain Ute Tribal members' religious ties and retained access to sacred cites in state parks, while failing to similarly acknowledge the Ute Indian Tribal members' ties, or allowing the same access, places an undue burden on the Ute Indian Tribal members' ability to practice their religion.

99. When the enforcement of statutes like the one at hand infringe on such fundamental rights, courts can presume discriminatory intent either "directly or circumstantially." *Ashaheed,* 7 F.4th at 1250 (citing *SECYS, LLC v. Vigil,* 666 F.3d 678, 686 (10th Cir. 2012).

100. The Tenth Circuit went on to explain that "[c]ircumstantial proof is showing that the plaintiff was treated differently from similarly situated persons who are 'alike in all relevant respects.'" *Id.*

101. The Ute Indian Tribe is being treated differently from the Southern Ute Indian Tribe and Ute Mountain Ute Tribe despite being exactly alike in all relevant respects, barring the Ute Indian Tribe's forced removal from Colorado.

102. This continued burden placed on the Ute Indian Tribe's members, unique vis-à-vis the Southern Ute and Ute Mountain Ute tribal members, consequently burdens the fundamental right of the Tribe's members' to freely exercise their religious beliefs.

103. If the legislative intent is to reduce barriers for Southern Ute Indian and Ute Mountain Ute Tribal members to access state parks located within their ancestral lands—lands containing sacred sites—then there are no set of facts that may reasonably be conceived to justify Defendants' disparate treatment of the Ute Indian Tribe via their exclusion from the Statute, given the likeness of the Ute Indian Tribe to the Southern Ute Indian Tribe and Ute Mountain Ute Tribe in all relevant respects.

104. The disparate treatment of the Ute Indian Tribe vis-à-vis the Southern Ute Indian Tribe and Ute Mountain Ute Tribe also has dormant commerce clause implications under Article I Commerce Clause (U.S. Const. art I, § 8), as it "discriminates against . . . *non-resident actors* [and does not advance] . . . 'legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Anvar v. Dwyer*, 82 F.4th 1, 8 (1st Cir. 2023) (quoting *Dep't of Revenue of Ky*, 553 U.S. at 338) (emphasis added)).

105. Providing free access to these parks for *all Ute Tribes* would serve a legitimate local purpose considering the Utes' historical, spiritual, and cultural ties to the state park land.

106. Defendants' violation of the Tribe's fundamental rights is not narrowly tailored to achieve a compelling government interest in the least restrictive means possible.

107. C.R.S. § 33-12-103.8, as applied to the Ute Indian Tribe, thus violates the Tribe's members' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution, with dormant commerce clause implications, by infringing on the Ute Indian Tribe's members' fundamental right to free exercise of religion.

## THIRD CLAIM FOR RELIEF

**Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection**

**C.R.S. § 33-12-103.8 Unlawfully Discriminates Against the Ute Indian Tribe's Members in Violation of the Fourteenth Amendment Equal Protection Clause Because They Belong to a Suspect Class on the Present Facts**

108. It is well established when Indian preference is given to Tribes and/or tribal members, it is based on the unique political—not racial—status of Indians in the United States. *E.g., Morton v. Mancari,* 417 U.S. 535, 538 (1974); *United States v. Antelope*, 430 U.S. 641, 645 (1977).

109. This unique political status held by Indians means that challenges to Indian preference and/or classifications are not typically subject to heightened scrutiny.

110. But it is important to note that this action is not challenging the over-arching Indian preference that Defendants presently give the Southern Ute Indian Tribe and Ute Mountain Ute Tribe through state park access.

111. Rather, the Ute Indian Tribe challenges Defendants' failure to include it along with the Southern Ute Indian Tribe and Ute Mountain Ute Tribe within the context of this permissible Indian preference.

112. At least in this case, the Ute Indian Tribe's members are a suspect class, thus providing an independent basis (beyond the other arguments for doing so within this Complaint) for this Court to apply a higher-level scrutiny considering the *Carolene Products* "discrete-and-insular-minority" test. *E.g.*, *United States v. Carolene Products Co.*, 304 U.S. 144, 152 fn.4 (1938).

113. The Ute Indian Tribe's members are a suspect class on the facts at hand, and this position is illuminated through their possession of all the "traditional indicia of suspectness" as outlined in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).

114. The history of discrimination endured by the Ute Indian Tribe in Colorado, frequently by state actors operating under color of law, was already recognized by this Court at length in *Cuthair,* 7 F. Supp. 2d at 1156.

115. The Ute Indian Tribe's members also have a defining characteristic that often bears a relationship to their ability to perform or contribute to society—their Indian status, as it bears relevant in many aspects of American society (*e.g.* criminal/civil jurisdiction and healthcare access).

116. The Ute Indian Tribe's members also have a defining trait that is immutable or distinguishable and establishes them as a discrete group and protected class. *Smith-Barrett v. Potter*, 541 F.Supp.2d 535, 539 (W.D.N.Y. 2008) (citing cases).

117. Indians roughly make up two percent of the American population, and their defining trait—racial and political Indian status—is unique in America considering that Native Nations long predate the Constitution and the founding of America.

118. Finally, for purposes of a suspect class analysis, the political powerlessness of the Ute people is apparent in, *inter alia*, the fact that its comments on the draft bill went unheeded and the fact that no Ute Indian Tribal member, let alone Indian, serves on any branch of the Colorado state government. Thus, the Tribe's members are a suspect class on the facts at hand given this lack of political power and the lack of representation in decision making within Colorado state government.

119. C.R.S. § 33-12-103.8 violates the Equal Protection Clause because Ute Indian Tribal members belong to a suspect class on the facts at hand (vis-à-vis the Southern Ute Indian and Ute

Mountain Ute Tribal members) under the *Carolene Products* "discrete-and-insular-minority" test.

**FOURTH CLAIM FOR RELIEF**

**C.R.S. § 33-12-103.8 Violates the Free Exercise Clause and the American Indian Religious Freedom Act**

120. The Tribe realleges the preceding paragraphs and incorporates them by this reference.

121. The Ute people, who long predate Colorado statehood, have sincerely held religious beliefs arising from their deep connections to what are now Colorado state park lands.

122. The Colorado Legislature acknowledged as much in C.R.S. § 33-12-103.8 by specifically mentioning that these lands may contain "sacred sites." *Supra* ¶ 16.

123. For reasons explained in ¶¶ 58-69 of this Complaint, these lands do contain sacred sites for all Ute people, considering their sincerely held religious beliefs and their deep spiritual connections to the lands.

124. The Ute people include the Southern Ute Indian Tribe and the Ute Mountain Ute Tribes' members, who are presently granted certain rights to Colorado state park lands.

125. Beyond just the Southern Ute Indian Tribe and the Ute Mountain Ute Tribes' members, the Ute people also include the Ute Indian Tribe's members—most of whom reside in Utah on the Uintah & Ouray Reservation because of their removal from Colorado.

126. Defendants acknowledge that the Southern Ute Indian Tribe and the Ute Mountain Ute Tribes' members have rights in-and granted access to- these sacred sites, but wrongly discriminate against the Ute Indian Tribe—which has these exact same rights in the sacred sites.

127. In analyzing Free Exercise claims under the First Amendment, courts apply the highest level of scrutiny when a law is not neutral or generally applicable. *E.g., Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022).

128. Failing either the neutrality or general applicability test triggers strict scrutiny—passing muster under both prongs is not necessary. *Id.*

129. A law can fail the neutrality test by discriminating on its face or if a religious exercise is otherwise its object. *Id; see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993).

130. A law can also fail the neutrality test if it is specifically directed at religious practice. *Kennedy,* 597 U.S. at 526.

131. A law can fail the general applicability test by providing a mechanism for individualized exemptions. *Id.*

132. C.R.S. § 33-12-103.8 discriminates on its face because, as written, it allows the Southern Ute Indian Tribe and Ute Mountain Ute Tribe's members unburdened access to state parks containing sacred sites, while burdening the Ute Indian Tribe's members access to those same parks containing the same sites sacred to them as well.

133. The word "sacred" is defined as, (1) "dedicated or set apart for the service or worship of a deity", (2) "worthy of religious veneration", and (3) "of or relating to religion: not secular or profane." *Sacred*, MERRIAM-WEBSTER (last visited October 28, 2025), https://www.merriam-webster.com/dictionary/sacred.

134. Given the Statute's text, the reference to "sacred sites" in the Statute supports the conclusion that the Statute's object is directed at religious practice.

135. The Statute's text and legislative intent support the conclusion that a religious motivation is the object of the law.

136. The Free Exercise Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the 'performance of (or abstention from) physical acts.'" *Kennedy,* 597 U.S. at 525.

137. C.R.S. § 33-12-103.8 does not protect the ability of the Ute Indian Tribe's members to visit their sacred sites nor live out their faith via the performance of physical acts—such as those related to hunting and ceremony—in the state parks, despite Defendants protecting that ability for the Southern Ute Indian Tribe and Ute Mountain Ute Tribe, and the Statute is thus unconstitutional as applied to the Ute Indian Tribe's members.

138. The Statute is not generally applicable because it creates individualized exemptions for the Southern Ute Indian Tribe and the Ute Mountain Ute Tribes' members to access sacred sites in Colorado state parks, and unlawfully discriminates against the Ute Indian Tribe by wrongfully distinguishing it from the other Bands.

139. Given the Statute operates as an exemption for the Colorado Ute Tribes to access the state parks to visit sacred sites, Defendants have no legitimate basis for not extending the same exemption to the Ute Indian Tribe's members who have the same exact sincerely held religious and spiritual beliefs and connections to the sacred sites found in the same state parks.

140. Defendants do not serve any legitimate rational, substantial, or compelling interest in burdening the Ute Indian Tribe's members access sacred sites vis-à-vis the Southern Ute Indian Tribe and Ute Mountain Ute Tribe.

141. To achieve any legitimate interest that Defendants may assert, Defendants have alternative less restrictive mechanisms available.

142. Accordingly, as applied to the Ute Indian Tribe, Defendants enactment and enforcement of C.R.S. § 33-12-103.8 violates the Ute Indian Tribal members' free exercise rights.

143. C.R.S. § 33-12-103.8 also directly contravenes the federal government's official policy regarding religious freedom and Indians as promulgated in the American Indian Religious Freedom Act.

144. That policy states the United States shall "protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ... including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." Pub. L. 95-341, 92 Stat. 469 (1978), (codified as amended at 42 U.S.C. § 1996).

145. Although AIRFA does not create a standalone cause of action, as official federal policy, this Court can turn to it as instructive authority in considering the arguments raised in this Complaint.

146. C.R.S. § 33-12-103.8 as applied to the Ute Indian Tribe's members violates AIRFA by expressly burdening their "access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996.

147. The Statute's exclusion of the Ute Indian Tribe creates a barrier for its members to access their sacred sites—a barrier that the Statute was explicitly enacted to remove.

148. Further, the Statute's exclusion of the Ute Indian Tribe encumbers the right of the Tribe's members to freely practice their faith through, but not limited to, ceremonies, hunting, and prayer.

149. The policy delineated in AIRFA and the exclusion of the Ute Indian Tribe from C.R.S. § 33-12-103.8 presents an irreconcilable conflict.

150. This irreconcilable conflict between AIRFA and the Tribe's exclusion from C.R.S. § 33-12-103.8 supports a ruling that the Statute violates the Free Exercise Clause of the First Amendment.

## FIFTH CLAIM FOR RELIEF

### C.R.S. § 33-12-103.8 as Written and Applied to the Ute Indian Tribe Deprives the Tribe of Rights Guaranteed by the First Amendment and Fourteenth Amendment Creating an Independent Cause of Action Under 42 U.S.C. § 1983

151. The Tribe realleges the preceding paragraphs and incorporates them by this reference.

152. 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress...

153. As the Tenth Circuit noted, "[a] tribe may or may not qualify as a person, 'depending on whether the tribe's asserted right [is] of a sovereign nature." *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.,* 868 F.3d 1199, 1205 (10th Cir. 2017) (quoting *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 122, 1234 (10th Cir. 2010)).

154. To determine whether a Tribe or any other government, e.g., a state or foreign government, is a "person" under § 1983, a court must look at whether the government is asserting a right that it has solely because it is a sovereign, or whether it is asserting a right which arises from other laws. *E.g., Inyo Cnty. v. Paiute-Shoshone Indians*, 538 U.S. 701 (2003) (a tribe is not a "person" for a § 1983 claim when its claim is based upon a tribal sovereign immunity from suit).

155. Put differently, "whether a sovereign entity may be considered a 'person' depends on the specifics rights that it is asserting." *Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 595 (6th Cir. 2009) (recognizing that Indian tribes have a private right of action to sue for violations of their Constitutional rights under 42 U.S.C. § 1983 related to proprietary interests).[8]

156. At its core, "[§] 1983 was designed to secure private rights against government encroachment…" *Inyo Cnty., Cal.*, 538 U.S. at 701.

157. In *Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. Ure*, the Ute Indian Tribe asserted in its Complaint that it was deprived of due process and equal protection as a participant in the bidding process to purchase real property. 737 F. Supp. 3d 1183, 1201 (D. Utah 2024).

158. In that case, the court held the Tribe had standing to sue under § 1983 to protect its rights against unlawful discrimination or deprivation of due process of law. *Id.*

---

[8] *See, e.g., Pfizer, Inc. v. Gov't of India,* 434 U.S. 308 (1978) (holding that a foreign nation, as a purchaser of antibiotics, was a "person" when suing pharmaceutical manufacturers for violating antitrust laws); *Georgia v. Evans*, 316 U.S. 159 (1942) (holding that a State, as a purchaser of asphalt, was a "person" when suing under the Sherman Act for restraint of trade); *Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. Ure*, 737 F. Supp. 3d 1183, 1201 (D. Utah 2024) (holding that the Ute Indian Tribe qualified as a "person" under § 1983 upon alleging discrimination when it sought and was denied the purchase of real property).

159. Here, reasoning by analogy for this specific claim for relief, the Tribe is alleging that Defendants have deprived it and continue to deprive it of equal protection of the laws under the Fourteenth Amendment and the right to free exercise of religion under the First Amendment.

160. The Tribe can be deemed a "person" under 42 U.S.C. § 1983 because the First Amendment and Fourteenth Amendment rights violated are distinguishable from other rights retained by the Tribe solely on account of its status as a sovereign.

161. Further, qualified immunity does not apply in this case because that defense "does not apply to public officials sued in their official capacity." *Swartz v. Beach*, 229 F. Supp. 2d 1239, 1266 (D. Wyo. 2002) (quoting *Moore v. City of Wynnewood*, 571 F.3d 924, 929 n.4 (10th Cir. 1995)).

162. The Tribe seeks a declaratory judgment pursuant to 42 U.S.C. § 1983 that Defendants have acted and continue to act under color of state law to deprive the Tribe of its First Amendment and Fourteenth Amendment rights through the enactment and enforcement of C.R.S. § 33-12-103.8.

## PRAYER FOR RELIEF

WHEREFORE, The Tribe prays for the following relief:

1. A declaratory judgment stating that:

   A. C.R.S. § 33- 12-103.8, as written, violates the terms of the Brunot Agreement, and that the Brunot Agreement guarantees the Tribe the right to hunt, fish, and gather on the lands, same as the Ute Mountain Ute Tribe and the Southern Ute Indian Tribe.

B. The Statute violates the Equal Protection Clause of the Fourteenth Amendment because it infringes upon the fundamental right of the Tribe's members to practice their religion.

C. The Statute unlawfully discriminates against the Ute Indian Tribe's members in violation of the Fourteenth Amendment Equal Protection Clause because they belong to a suspect class on the present facts.

D. The Statute violates the Free Exercise Clause of the First Amendment because C.R.S. § 33-12-103.8 is not a neutral nor a law of general applicability and fails to comport with the policy promulgated by the federal government in the American Indian Religious Freedom Act.

E. That Defendants have acted and continue to act under color of state law to deprive the Tribe of its First Amendment and Fourteenth Amendment rights through the enactment and enforcement of C.R.S. § 33-12-103.8, and in turn the Tribe is entitled to the remedy of a declaratory judgment pursuant to 42 U.S.C. § 1983.

2. That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment.

3. That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 19th day of December, 2025.

/s/ Ethan Tourtellotte
Ethan Tourtellotte
PATTERSON, REAL BIRD, AND RASMUSSEN LLP
1900 Plaza Drive
Louisville, CO 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
Email: etourtellotte@nativelawgroup.com

*Attorney for Plaintiff Ute Indian Tribe of the Uintah & Ouray Reservation*